DOROTHY CUTRELL, APPELLANT, V. JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY, APPELLEE.

17 N. W. 2d 465

FILED FEBRUARY 2, 1945. No. 31828.

*Russell C. Anderson* and *Clinton Brome,* for appellant.

*Gray & Brumbaugh, contra.*

Heard before SIMMONS, C. J., PAINE, CARTER, MESSMORE, YEAGER, CHAPPELL and WENKE, JJ.

CHAPPELL, J.

The plaintiff brought this action at law to recover as beneficiary upon a life insurance policy which contained a clause providing for payment of double indemnity if death of the insured resulted from bodily injury sustained solely through external, violent and accidental means. Defendant admitted liability for and paid the face of the policy, $250,

but denied liability for double indemnity. Defendant contends that the gunshot wound sustained by the insured and death resulting therefrom was not effected solely through accidental means but was brought about by, and was the direct, natural and probable result of, the insured's own voluntary, intentional, wrongful acts and violation of law.

Upon trial to the court and jury defendant's motion to direct a verdict in its favor made at the conclusion of plaintiff's evidence was overruled, but upon its renewal at the conclusion of all the evidence the motion was sustained. Thereupon the trial court discharged the jury and dismissed the case at plaintiff's costs. Motion for new trial was overruled and plaintiff appealed, contending that the trial court erred in so doing for the reason that under all the evidence adduced the issue of accidental death was a question for the jury. We find that this contention has merit.

The facts are simple and there is not much dispute about them. In making plaintiff's case the beneficiary testified that she was the wife of Clarence A. Cutrell, the insured, at the time of his death on May 28, 1942; that she last saw him alive between 7:00 and 7:30 p. m. in the evening before his death, when they were together at the home of his sister; that insured left the sister's home but witness stayed for approximately an hour thereafter; that insured then, generally speaking, was in good physical condition, but was not feeling very well because of a toothache he had been having for a few days; and that the next time witness saw him was at the undertaker's, he was dead.

A police surgeon testified for plaintiff that on May 28, 1942, at about 2 o'clock a. m. he was called to 42nd & Q streets in Omaha, Nebraska, for the purpose of examining the body of a man lying dead in the street who had possibly been run over by an automobile. The police arrived ahead of the doctor. Upon the doctor's arrival the body of the insured was found lying prone, with head toward the east, four to six feet from the curb on Q street. An examination of the body disclosed that the insured had a puncture wound three or four inches below the nipple on the left side of his

chest. Theré was no evidence of other external injuries. No gun or other firearm was found upon him but it was presumed to be a gunshot wound since the officers soon thereafter discovered a bullet hole in a window of a small house near by. The coroner's physician took possession of the body and a post mortem conclusively disclosed that it was a gunshot wound and that the death of insured was caused thereby.

In presenting the defense a city engineer testified that he made certain measurements and prepared a plat showing the contour and physical surroundings at 42nd & Q streets. The plat appears in the record. From it, and his testimony, we adduce that Q street runs east and west, and 42nd street enters it from the south at an angle to the southwest but does not extend north of Q street. A small house, the only building on either the south or north side of Q street between 41st and 42nd streets, stands, facing or fronting north, on the southeast corner of 42nd & Q streets. It is known as 4145 Q street. It has a small lean-to or entrance vestibule on the north side, and the only door entering the house is on the east side of this vestibule. There is a window in the house itself just east of the vestibule door and facing north from which a person can observe the door and to the north across the sidewalk, the south side of which is only six feet distant, and into Q street, the curb of which is only twelve feet distant therefrom. The sidewalk runs east and west and is four feet wide. The north side of the vestibule is only 1.3 feet from the south edge of the sidewalk from which a concrete base extends continuously up to the vestibule, the door and the window. In other words, the only door entering the house was from the front and but a step from the public sidewalk. There are two street lights on the north side of Q street, one a short distance to the east of the house, and the other farther to the west of it.

A police officer testified that at about 3 o'clock a. m., May 28, 1942, he made photographs of the small house from the northeast. These photographs appear in the record and show the window with the bullet hole in it and the vestibule,

door, sidewalk, curb, and part of Q street, with the body of the insured lying thereon to the north and east of the door.

One John Patrick Hurley testified in substance, that he owned the house at 4145 Q street, lived in it, and worked on WPA. Further, there are two rooms in the house, a bedroom and a room used as a kitchen and sitting room. On the night in question he was not feeling well and went to bed early. In the night, while he was still awake, he heard a racket and saw the shadow of a person passing an east window. He then heard somebody pounding on the door and he called in a loud voice to get out of there. He called three or four times but got no reply and the person kept pounding on the door as if with his fists. The door was loose and you could hear it plainly. He waited a minute or two and then got his revolver from under his pillow, pulled back the curtain on the window next to the door, looked out and saw a man, whom he could not recognize, pounding on the door with his fists and putting first one shoulder against it and then the other as if to break the door in. With the barrel of his revolver a foot and a half distant from the window he then fired a shot through the window to scare the person, without intending to kill him. The man at the door then left running away fast to the northwest and witness went back to bed.

The witness Hurley is positive that the man ran northwest, but it will be remembered that the body of the deceased was found lying in the street to the northeast of the door. Hurley further testified that the street lights were burning at the time and that although the house shaded the light a little right in the doorway and the window was dirty, he could see any one there in front of the house or on the sidewalk, and that the man pounding on the door was the only person seen by him. The police came an hour or so after the shooting and this witness then saw the body of a man, a stranger whom he had never personally known, lying on a stretcher.

The question presented is whether the insured brought about the assault upon himself by his own wrongful act or

voluntarily incurred an obvious hazard of the assault under such circumstances that he would naturally be presumed to know that the injury would probably be inflicted, or voluntarily placed himself in a position that would naturally and probably be expected to bring about such an assault upon him. If the insured did not bring about the assault upon himself in such manner the bodily injury received and death resulting therefrom was effected by accidental means; otherwise it was not effected by accidental means. See *Bernhard v. Prudential Ins. Co.*, 134 Neb. 402, 278 N. W. 846; Cornelius, Accidental Means (2d ed.) 50.

In *Railway Officials & Employees Accident Assn. v. Drummond*, 56 Neb. 235, 76 N. W. 562, it was held: "An accident, within the meaning of contracts of insurance against accidents, includes any event which takes place without the foresight or expectation of the person acted upon or affected thereby." The opinion quotes with approval from *American Accident Co. v. Carson*, 99 Ky. 441, 59 Am. St. Rep. 473, in part as follows: " * * * if as to the person injured the injury was unforeseen, unexpected, not brought about through his agency designedly, or was without his foresight or was a casualty or mishap not intended to befall him, then the occurrence was accidental, and the injury one inflicted by accidental means within the meaning of such policies." See, also, Cornelius, Accidental Means (2d ed.) 49.

Statements of the rule applicable to accident cases generally will be found in *Western Commercial Travelers' Assn. v. Smith*, 8 Cir., 85 Fed. 401, 40 L. R. A. 653. See, also, *Zurich General Accident & Liability Ins. Co. v. Flickinger*, 4 Cir., 33 Fed. 2d 853. They are summarized in 6 Cooley's Briefs on Insurance (2d ed.) sec. 2(a), p. 5234, as follows: "Accidental means are those which produce effects which are not their natural and probable consequences. The natural consequence of means used is the consequence which ordinarily follows from its use—the result which may be reasonably anticipated from its use, and which ought to be expected. The probable consequence of the use of a given

means is the consequence which is more likely to follow from its use than it is to fail to follow. An effect which is the natural and probable consequence of an act or course of action is not an accident, nor is it produced by accidental means. It is either the result of actual design, or it falls under the maxim that every man must be held to intend the natural and probable consequence of his deeds. On the other hand, an effect which is not the natural or probable consequence of the means which produced it, an effect which does not ordinarily follow and cannot be reasonably anticipated from the use of such means, an effect which the actor did not intend to produce and which he cannot be charged (by reason of his own conduct) with the design of producing, is produced by accidental means. It is produced by means which was neither designed nor calculated to cause it. Such an effect is not the result of design, cannot be reasonably anticipated, is unexpected, and is produced by an unusual combination of fortuitous circumstances; in other words, it is produced by accidental means * * * ."

The fact that an accident policy does not contain a clause excluding liability for violation of law by the insured (as in the case at bar), is not always conclusive upon the question of liability. The rule is that if death results to an insured as the direct, natural, and probable consequence of a violation of law criminal in its nature in which the insured was intentionally engaged at the very time of his death, it is not accidental. *DeMello v. John Hancock Mutual Life Ins. Co.*, 281 Mass. 190, 183 N. E. 255. And, in this connection, there is also an applicable rule that, "It will not be presumed in any case that the law has been violated; every alleged violation must be established by competent proof." *State ex rel. Freeman v. Scheve*, 65 Neb. 876, 93 N. W. 169.

The case at bar is not one in which defendant seeks to enforce any exception created by the insurance contract. Therefore, as was held in *Dodder v. Aetna Life Ins. Co.*, 104 Neb. 70, 175 N. W. 651, "In suit on an accident insurance policy, the burden of proof is upon the plaintiff to show that death was accidental." See, also, *Clark v. Bankers Ac-*

*cident Ins. Co.,* 96 Neb. 381, 147 N. W. 1118; 6 Cooley's Briefs on Insurance (2d ed.) sec. 2(h), p. 5283. Be that as it may, it is fundamental that the law indulges in a presumption against suicide and murder, and against injuries intentionally self-inflicted or resulting from a criminal assault or unlawful acts of the deceased, and plaintiff has made a *prima facie* case of liability under the usual insuring clause of an accident policy when it has been shown that the insured died as the result of an obvious external and violent bodily injury such as a gunshot wound unless the circumstances disclosed are such as to overcome the presumption. Cornelius, Accidental Means (2d ed.) 73, 74; 31 C. J. S., sec. 135, p. 772; 1 C. J., sec. 278, p. 495; *Sawyer v. Mutual Benefit Health & Accident Assn.,* 121 Neb. 504, 237 N. W. 615.

If plaintiff has made such a *prima facie* case and defendants fails to introduce any evidence, the trial court should properly direct a verdict for plaintiff. The presumption, however, is rebuttable by direct or circumstantial evidence, and to avoid such a result defendant should go forward with or produce evidence tending to overcome or remove the presumption, and if competent evidence is adduced by defendant which is contrary to or inconsistent with such presumption, it disappears, although the facts upon which it rests may still remain proper to be considered in arriving at a conclusion. *Grosvenor v. Fidelity & Casualty Co.,* 102 Neb. 629, 168 N. W. 596; *Sawyer v. Mutual Benefit Health & Accident Assn., supra.* In such a situation it is ordinarily incumbent upon plaintiff to then take the initiative and show by other evidence that death was accidental. (*Bernhard v. Prudential Ins. Co., supra.*) Nevertheless, if evidence or inferences which may be logically drawn from facts appear in defendant's evidence consistent with or favorable to and supporting plaintiff's theory that death was accidental, the plaintiff is entitled to the benefit thereof. Thus is made effective and applicable the well-known rule that, where upon a jury trial at the close of all the evidence defendant moves the court for a directed verdict in

his favor, such motion must be treated as an admission of the truth of all material and relevant evidence admitted favorable to plaintiff, and all proper inferences to be drawn therefrom; and if the evidence tends to, and if believed is sufficient to, sustain the material allegations of the petition, and the petition states a cause of action, the case should be submitted to the jury for their determination. *Rhoads v. Columbia Fire Underwriters Agency,* 128 Neb. 710, 260 N. W. 174.

We are of the opinion that, under the evidence, facts and circumstances appearing herein, and applicable rules of law heretofore stated, the question of whether the death of insured was caused by accidental means was a question for the jury to determine under appropriate instructions, and that the trial court erred in sustaining defendant's motion and dismissing the plaintiff's case. Therefore, the judgment is reversed and the cause is remanded for a new trial.

REVERSED.