No. 13,462.

METROPOLITAN LIFE INSURANCE COMPANY *v.* ROMA.

(50 P. [2d] 1142)

Decided October 21, 1935.

494

Mr. Henry McAllister, Mr. John O. Rames, for plaintiff in error.

Mr. A. R. Morrison, for defendant in error.

*En Banc.*

Mr. Justice Burke delivered the opinion of the court.

Plaintiff in error is hereinafter referred to as the company, defendant in error as Mrs. Roma, and her deceased husband, Joseph P. Roma, as Roma.

Roma carried a $2,000 life insurance policy in the company and thereto attached a double indemnity contract for the same amount in case of accidental death not "the result of violation of law by the insured." Some person, unknown, entered Roma's home and shot him. The company refused payment on the ground that Roma's death was not due to an accident but the result of his violation of law. Mrs. Roma, beneficiary, brought this suit to collect. To the answer setting up said defense a general demurrer was filed and sustained. The company elected to stand, and to review the judgment for $2,133.33 thereupon entered against it prosecutes this writ.

The policy was written in November, 1930, in favor of Nettie Greco (plaintiff in error) then affianced to Roma and whom he later married. He was killed

February 18, 1933. The supplemental, or accident, contract provided for payment in case of Roma's death "as the result directly and independently of all other causes of bodily injuries sustained through external, violent and accidental means." The answer, which for the purpose of this review must be accepted as strictly true so far as the facts therein are well pleaded, alleges that Roma's death did not result "from accidental means within the meaning and intent of said supplemental contract." It further alleges, in substance, that for many years prior to his death Roma's vocation was that of a violator of the federal and narcotic laws and leader of an underworld gang so engaged, so known to outlaws, police, the press and the public; that the exigencies of his vocation and leadership therein constantly subjected him, as he well knew, to assassination, and caused him to go armed and attended by armed guards, to keep a supply of weapons in his home, and to own and operate a bullet-proof automobile; "that as a direct result of all the foregoing and while he was notoriously engaged in the violation of said laws and in conspiracy with others so to do, and inviting death thereby as aforesaid, a certain person or persons, a member or members of said underworld gangs, either rivals, enemies or associates of said Roma, but whose names are to defendant unknown, secured entrance to his home and shot and killed him."

■ ■ If this answer pleaded death by other than accidental means, as that term has been generally interpreted in the law of insurance, or if it pleaded death as "the result of violation of law by the insured" the demurrer was erroneously sustained. We think it did both. *Diamond v. N. Y. Life Ins. Co.*, 42 Fed. (2d) 910; *DeMello v. John Hancock Mut. Life Ins. Co.*, 281 Mass. 190, 183 N. E. 255. We prefer, however, to base the reversal of this judgment on broader and more comprehensive grounds. If the contract whose enforcement is here sought is contrary to public policy it is illegal and void and the courts will have nothing to do with it. Moreover,

"it is immaterial whether the information of such illegality comes from plaintiff or defendant, or is disclosed by pleadings or evidence." *Baker v. Couch,* 74 Colo. 380, 221 Pac. 1089.

 All contracts to commit crime are void. 13 C. J., p. 412, §342; 6 R. C. L., p. 715, §123. Contracts to defend one for contemplated criminal offenses are void. *Bowman v. Phillips,* 41 Kan. 364, 21 Pac. 230. "A promise to indemnify another for doing a private wrong or for committing a public crime is against public policy, and is void in law." *Arnold v. Clifford,* 1 Fed. Cas., No. 555, p. 1177.

 The provision in this contract excepting death due to violation of law is superfluous. It is a mere statement of a public policy which controls regardless of contract. *Hatch v. Mutual Life Ins. Co.,* 120 Mass. 550.

 If the contract pleaded expressly provided for payment in case of Roma's death at the hands of associates, or rivals, or law officers, while engaged in the perpetration of the crimes charged to him in this answer, no possible question of its illegality could arise. But the violation of public policy is no less certain where the parties enter into such a contract for such a purpose though that purpose be unexpressed in the writing. The moment the court becomes cognizant of the fact it will refuse further to aid either. If a man cannot buy from a life insurance company an express contract to pay his beneficiary if he lose his life in attempting murder he can buy no contract, however worded, enforceable in such a contingency. *Burt v. Union Cent. Life Ins. Co.,* 187 U. S. 262, 23 Sup. Ct. 139, 47 L. Ed. 216. It would be an idle gesture to say that one may not expressly insure himself against death so resulting and yet permit him to do the same thing by enforcing recovery in such a case under a contract silent on the subject. *Amicable Society v. Bolland,* 4 Bligh (N. S.), 194, 211. The courts will not thus construe into a contract a provision which,

if written there by the parties, would invalidate it. If contracts to defend one for contemplated crime, or hold one harmless for the perpetration of crime, are void, just as certainly, and for the same reason, are contracts of life insurance which expressly or by construction provide for indemnity for death resulting therefrom, when so invoked. Any contract providing indemnity for loss of life or property resulting from deliberate and intentional lawlessness is a contract to save one harmless for attacks upon the state, and the courts will give no ear to a litigant whose claim springs from war upon society.

Whether the company here knew, or should have known, the illegal purpose which this policy might serve, is immaterial. The company seeks no relief. Countless instances might be cited where because of the refusal to enforce contracts which are against public policy one of the parties is left in a peculiarly advantageous position, or the contrary. With that fact the courts do not concern themselves. They will not act as referees to divide the loot, nor attempt to do equity between the enemies of society with respect to their wrangles concerning the profits of attacks upon her. All attempts to enforce contracts for the violation of law, or for the protection of those who propose to violate law, or for the indemnification of those injured by deliberately and intentionally violating the law, strike at the very heart of the state and its courts will not wait supinely for the parties to raise the question but will take cognizance of it whenever and however it appears and act, or refuse to act, as the welfare of the state demands.

The judgment is reversed and the cause remanded, with directions to overrule the demurrer and permit Mrs. Roma to reply if she be so advised.

Mr. Chief Justice Butler and Mr. Justice Hilliard dissent.

Mr. Justice Bouck concurs in the conclusion.

Mr. Chief Justice Butler, dissenting.

I regret my inability to agree with the majority of my brethren concerning the disposition to be made of this case.

The complaint alleges, among other things, that Roma, the insured, "came to his death as a result of bodily injury sustained through external, violent and accidental means in this, to-wit: that as plaintiff is informed and believes and so alleges the fact to be, while the said * * * Roma was in his home in * * * Denver, * * * some person or persons unknown to this plaintiff entered said home and then and there by the use of firearms, did murder the said * * * Roma."

As an affirmative defense to the cause of action stated in the complaint, the company pleaded substantially as stated in the majority opinion.

1. *Violation of law.*

Counsel for the company say: "We lay less stress upon this point than we do upon the 'accidental death' feature." Naturally. To exempt the insurer from liability on this ground, "Not only must there be a causative connection between the violation of the law and the death, but such connection must be direct, and not indirect; proximate or immediate, and not remote." 6 Cooley's Briefs on Insurance (2d Ed.), p. 5217. The facts pleaded fail to meet the requirements. It would seem that at one time the company was of that opinion; for if the death of Roma was the result of his violation of law, the company, according to the terms of the policy, was not liable in any amount, and yet the company paid $2,000 to the beneficiary. The real controversy is over the double indemnity to be paid in case of accidental death.

2. *Accidental Means.*

Counsel for the company admit that Roma's death resulted from external and violent means, but contend, and this is their main contention, that it did not result from accidental means, as those words are used in the

policy. They admit, what my independent investigation has revealed, that "no authority upon a similar state of facts can be found." The authorities cited by counsel as analogous do not touch this case.

The case that most nearly approaches this is *DeMello v. John Hancock Mut. Life Ins. Co.*, 281 Mass. 190, 183 N. E. 255, cited also in the majority opinion. In that case the insured was a member of a crew on a rum-running boat, engaged in illicit traffic in intoxicating liquor, and at the very time of his death he was engaged in the transportation of intoxicating liquor in violation of a Federal statute. The boat he was on was signalled by a Federal revenue cutter to "bring to," but those in control refused to obey the signal, whereupon the revenue cutter fired upon the boat, killing the insured. The court held that the death did not result from accidental means, saying in part: "The insured knew that he was liable to be killed if those in control of the boat did not 'bring to' after the pendant [sic] and ensign had been hoisted, and a gun fired as a signal." The distinction between that case and the case at bar is obvious. There, death resulted as a natural and probable consequence of the illegal act in which the insured intentionally was engaged at the very moment of his death; hence it was held to be not accidental. The facts in the case at bar are entirely different.

In *Diamond v. New York Life Ins. Co.*, 42 Fed. (2d) 910, cited in the majority opinion, Diamond had murdered his wife. He was convicted and sentenced to death by electrocution. The sentence was executed. In a suit on a policy the plaintiff contended that the death was accidental within the meaning of the policy. The district court rejected such contention. Under the law of Indiana, murder was punishable by death, and the court held that Diamond "could reasonably have anticipated that his death would ensue by reason of the murder of his wife"; that death was not a remote probability"; that "when a man murders another he knows that his

own life may be forfeited to the state''; and that ''no legal casuistry or legerdemain can convert capital punishment into a death resulting from accidental cause.'' I cannot see how that case supports the holding of the majority in the present case.

The connection between the criminal career upon which Roma had entered and his death is not sufficiently close to justify the conclusion that his death was the natural and probable consequence of his activities. True, rivalry among so-called gangsters occasionally has resulted in death; but when we consider the many thousands of persons reputed to be gangsters and the wide scope of their activities, such occurrences have not been so frequent as to justify us in saying as a matter of law that one entering upon such a career may expect death as the natural and probable consequence. The averment that ''as a direct result'' of the facts alleged, some rival, enemy or associate of Roma shot and killed him is a mere conclusion. No facts are pleaded showing how death was a direct result of the facts pleaded, and the pleaded facts are not sufficient to justify the conclusion. ''Whether or not the means is accidental is determined by the character of its effects. Accidental means are those which produce effects which are not their natural and probable consequences. The natural consequences of means used is the consequence which ordinarily follows from its use —the result which may be reasonably anticipated from its use, and which ought to be expected. The probable consequence of the use of a given means is the consequence which is more likely to follow from its use than it is to fail to follow.'' 6 Cooley's Briefs on Insurance (2d Ed.), p. 5234.

It may be noted that the policy was issued November 22, 1930. That, according to the company's plea, was at the very height of Roma's criminal career, after Roma was twice convicted, and when his reputation was notorious. And yet, notwithstanding all that, the company considered Roma a good risk, for it issued the life in-

surance policy and took, and of course retained, the money he paid for such protection.

In my opinion, the trial court did not err in sustaining the demurrer to the answer or in rendering judgment for the plaintiff. The judgment should be affirmed.

Mr. Justice Hilliard concurs herein.